Daniel, J.
This suit is founded on a single bill in these words:
“ $ 4,000. Four years after date I bind myself, my heirs, &c. to pay Francis Smith or order four thousand dollars, for value received. Witness my hand and seal this 30th September 1823.
JVm. JH. Spiller. [Seal.]”
On the back of it was a memorandum in writing as follows:
“ Memo.—If I do not collect the money due on the within note of my nephew Hickman Spiller during my life, then it is never to be collected; and I give him that sum.

Francis Smith.

Sept. 30, 1823.
Teste: A. Findlay A
*322 This memorandum appears to have been partially erased by means of a pen drawn over it; but the words were left sufficiently plain to be read by taking a little care., Smith died in 1844, and it is most probable that this erasure was made by him a few years before his death. Findlay his friend and confidential agent, who had frequent access to his papers, states in his testimony, that since the execution of the note (bond) he had frequently seen it, and always with the endorsement on it unobliterated until some twelve or eighteen months before Smith’s death, when he saw that a pen had been drawn over the endorsement.
The case turns on the legal character and effect of this endorsement. The defendant contending, on his part, that it should be treated as a part of the writing obligatory, and that Smith could not cancel it without at the same time canceling the whole bond.; and the plaintiff on the other hand, endeavoring to maintain that the memorandum endorsed was testamentary in its nature; and that consequently Smith had a perfect right to cancel or obliterate it, and leave the bond still in full force. These opposing views are distinctly presented by the second plea, the replication thereto and rejoinder; and were also necessarily involved in the plea of non est factum and the issue joined thereon. The same views of the character of the endorsement, with little variation, are disclosed by the parties respectively in the instructions which they severally asked from the court, and in the opposition which each made to the instructions asked by the other.
The course of the court in respect to the instructions, the verdict and judgment are in accordance with the views of the defendant. Are they correctly so ?
In the cases of Broke v. Smith, Moor 679 ; Burgh v. Preston, 8 T. R. 483; and Gordon v. Frazier, 2 Wash. *323 130, the general principle is asserted, that a memorandum endorsed on a bond at the time of its execution, operating in favor of the obligor, and signed by the obligee, is to be considered as part of the condition of the bond. And in the cases of Creig v. Talbot, 9 Eng. C. L. R. 56; Shermer v. Beale, 1 Wash. 11; and Price v. Kyle, 9 Gratt. 247, decided by this court, at its last session in this place, the same rule was held applicable to like memoranda made at dates subsequent to the execution of the bonds on which they were respectively endorsed.
The endorsement under consideration bears date on the same day with the bond, (30th September 1823,) and it is proved by the attesting witness that it was made and signed by Smith immediately after Spiller had signed and sealed the bond, at the same desk, and before the bond had been folded up and put away.
If then the language employed in the memorandum can by any fair interpretation or intendment, be regarded as language of contract or agreement, there ought, I apprehend, to be no hesitation in holding, under the authority of the cases above cited, that the memorandum constitutes a condition to the bond. It has been insisted however by the counsel of the plaintiff here, that whatever might be the force of such decisions as applied to an endorsement, the words of which imported a contract or agreement on the part of the obligee, they can be of no avail when invoked as authority to control the operation of an endorsement whose language is plainly testamentary: That in construing the endorsement we can look only at the bond and endorsement; and that the words employed in the latter are not susceptible of any other import than that of a testamentary disposition of the former: that the endorsement is nothing more than a bequest of the bond. It must be conceded that a writing, executed by an obligee on the back of a bond, plainly indicative *324 of a testamentary purpose, would not (if in other respects valid) cease to he a will merely because of its ■ position, even though it should contain no other disposition of property than that of the bond, in favor of the obligor. It is however equally obvious to remark, that it is of rare occurrence that a will or testamentary disposition of property is found on the back of a bond. And where the language of a writing executed by the obligee and occupying such a position in reference to a bond is of equivocal or doubtful meaning, indicative in some aspects of a testamentary purpose, and yet susceptible of a construction which would make the words employed words of contract, qualifying the bond in any degree however slight, advantageously to the obligor, the mere position of such writing may, I think, in a controversy respecting its true character, be properly relied on as a circumstance tending to show that the obligee designed the writing as a binding rather than as a testamentary instrument. And in all such controversies, when the question is not as to the meaning of words employed in an instrument of well defined character, but whether a paper of a doubtful character was designed to operate as one instrument or as another, all the circumstances attending the transaction, the cotemporaneous conduct and declarations of the parties evincive of their purposes and motives, may be looked to as showing what kind of instrument was within their contemplation and design.
The case of Robertson v. Dunn, 2 Murph. R. 133, cited by the defendant’s counsel, is one strongly illustrative of this rule. There the question was, whether a certain instrument was to be considered a deed of gift or a testamentary paper. It was written by a friend for the maker, who told him at the time that she wished him to write a deed of gift. After reciting that the instrument was in consideration of the love and affection which the maker had for her children, *325 the first clause proceeds in these words ; “ 1st. I give and devise to my son Needham one negro man Essex, one negro girl Martha, two feather beds, steads and furniture, and one horse, to be possessed after my death.” By the second and third clauses like provisions were made for two other children. And the fourth and last clause was as follows : “ 4fchly. All the rest of my estate that I may die possessed of, I give to my three sons Christopher, Herbert and John.” The court, after adverting to the use of the word devise as a slight circumstance tending to show a purpose to make a will, referred to the words “ to be possessed after my death,” employed in the first, second and third clauses, as showing a precaution which would have been useless in a will, which could not take effect until after the death of the testator; and in respect to the fourth clause, the judge delivering the opinion said there was nothing in it indicative of the way in which the maker of the instrument intended it to operate; for whether the property given by it was a gift or legacy, its-'quantum was referable to her death and could not be ascertained before. The fact that no executor was appointed, and the circumstance that the recitals expressed that the gifts were made in consideration of love and affection, which expression would have been unnecessary in a will, were also relied on as showing that a gift and not a will was- intended ; and the judge in conclusion said, that in order to explain all doubt and to ascertain whether the person who executed the paper intended it to operate as a deed of gift or a will, it was proper to look not only to the contents of the instrument, but also to the evidence showing how she really considered it; and seeing that she had called upon the witness to write her a deed of gift and to have it recorded, which it was not very likely she would have done, had she believed she was making a will, the *326 court found no difficulty in treating the instrument as a deed, and not as a testamentary paper.
The language of the endorsement before us is of equivocal import. The contingent benefit designed for the obligor could not be fully consummated till the death of the obligee; and in this respect the endorsement is like a will. But in one most important feature it differs from a will: For whilst a will is revocable in divers ways, the disposition made in favor of the obligor could, according to the terms of the endorsement, be revoked or annulled only in one mode, to wit: by the collection of the bond by the obligee in his life time. It is unnecessary and unusual to insert in a will or testamentary disposition a clause declaring the right of the testator to revoke, or making its bequests dependent on the contingency that the testator should not in his life time revoke them. And it would be not only unnecessary and out of the usual course, but wholly inconsistent with the nature of the instrument, to provide, in a paper designed as a will, for a power of revocation by some particular mode, when with or without such provision, the paper itself could only continue to exist by the pleasure of -the maker, and could at any moment be made nought by a single stroke of his pen. This feature in the writing in question, accompanied by the fact that it was endorsed on the bond cotemporaneously with the execution of the latter, tends to the conclusion that something other than a mere testamentary disposition of the bond was in the design of the parties. The manner in which the endorsement was intended to operate is, at least, by this view, made doubtful, and a resort to the circumstances leading to and attending the execution of the bond and endorsement, rendered proper.
It appears from the evidence that at the time of the execution of the bond and endorsement, Smith was a *327 man of great wealth, and that he had only one child, a daughter; that Spiller was his nephew, (his only nephew of the whole blood;) that he had bepn raised by Smith, who entertained strong feelings of affection for him; and that Smith had often avowed and manifested a strong desire to advance him; that Spiller was desirous of entering into a partnership in mercantile business with John & R. M. Preston; that he was without means; that the portion of capital to be paid by Spiller, into the mercantile concern, was five thousand dollars, and that it was furnished him by Smith. It does not appear at what precise time the money was advanced by Smith, but it is probable that four thousand dollars was advanced at the time the bond was executed, or a few days before; as there was a letter of Smith’s in evidence, dated the 12fch September 1823, twelve days before the execution of the bond, and directed to Spiller, in which he informs him that four thousand dollars was ready; and it is proved by Findlay the subscribing witness, that the bond was executed for the four thousand dollars, and that some time thereafter (when, he does not state,) Smith either gave or remitted to Spiller, the farther sum of one thousand dollars, for which last sum, no note was ever executed, and of which there was no entry ever made by Smith on his books.
The witness farther proved that he was present at the execution of the bond; that he was requested by Smith to write it, and did so; that on Smith’s telling him to write the bond, Spiller seemed a good deal surprised, and showed both by his manner and his remarks, that he had not expected to be called upon to execute a bond; that while the witness was writing the bond or immediately after, when Spiller was called upon to sign it, he made some objections to doing so, and remarked to Smith, (as well as witness could recollect,) that if ever he was able to pay the *328 amount, lie could do so as well without the bond as with it. That some conversation then took place between Smith and Spiller, the words or purport of which the witness could not recollect; that Spiller then signed the bond; and that Smith immediately thereafter, as has been before stated, made and signed the endorsement at the same desk, before the bond was folded up and put away; and that the endorsement was then shown to Spiller.
In reply to a question propounded by the defendant to the witness, whether there was not on his own mind an impression, made by what occurred at the time when Spiller first objected to sign the bond, and then after conversation with Smith did sign it, that the object of Smith in requiring a bond was to provide for Spiller in the event of his failure in business, he said the. impression had for a long time been on his mind that Smith did intend to secure the amount of the bond, in the event of Spiller’s failure in business, for the benefit of Spiller; but he could not say whether such impression was on his mind at the time of the execution of the bond, or that it was produced by any conversation or anything that then occurred; nor did he know that it was produced by anything said either by Spiller or Smith, at any time, in relation to the bond.
Apart from the impressions on the mind of the witness as to the object of Smith in requiring a bond, (to which, as the witness could not refer them to anything said or done by the parties it would be improper to attach much, if any weight,) the evidence of what occurred at the time of the transaction tends, I think, very strongly to support the theory of the case, as maintained by the defendant’s counsel here, to wit, that the advancement of the money was understood by the parties not as an ordinary loan; but was made with the understanding that if Spiller should fail in *329 business, Smith might, if he should think proper to do so, collect the amount and dispose of it in such manner as he should think best for Spiller and his family. It is manifest that Spiller did not look upon the advancement as placing him and his uncle in the ordinary legal relation to each other of debtor and creditor. Else why should he object to signing the bond or express any surprise that one should be demanded ?
Be this as it may, the inference is irresistible that the endorsement operated as an inducement leading to the execution of the bond. The mere order of time in which the bond and endorsement were executed is immaterial. Spiller objects to signing the bond; a conversation then takes place between him and Smith, and then Spiller signs the bond, and Smith immediately thereupon makes and signs the endorsement. It would be in direct opposition to any fair inference which can be drawn from the testimony, to suppose that the endorsement was made by Smith ex mero motu, and not in pursuance of some understanding had between the parties immediately before the execution of the bond. It may be conceded that if the endorsement was in form and phrase plainly a testamentary disposition, the fact that it was placed on the bond by the agreement or understanding of the parties, would not prevent it from operating as a will. And it is true that the conversation between the parties immediately preceding the execution of .the instrument is not detailed, and that there is nothing expressly contradicting the hypothesis of the plaintiiPs counsel,, that whatever might be Smith’s purposes with respect to the collection of the bond, he did not mean to come under any obligation respecting them ; thatSpiller’s objection to executing the bond was not founded on any right he had to insist on terms qualifying his .obligation or in any distrust which he entertained of the manner in which Smith would exercise the power which the bond would confer upon *330 him; hut in an apprehension that, by the death of Smith without a will, the generous purposes of the latter, then entertained and avowed, with respect to the ultimate disposition of the bond, might be accidentally defeated; and that the objection was overcome by Smith’s agreeing to place on the back of the bond a testamentary memorandum that the bond should never be collected, if not collected by himself during his life.
But as we have endeavored to show, the endorsement is not on its face plainly a will, but is of doubtful character ; and as by the fair inference to be drawn from the testimony, it appears to have been made in pursuance of an agreement between the parties, it would, I think, be more reasonable to suppose that it was designed to operate as a contract rather than as a will.
The instrument whose character is controverted, is found not where we should expect to find a will, but where we would naturally look for a defeasance, condition or qualification of the obligation to which it refers. It is shown to have been placed there not by the mere spontaneous act of the writer, but in pursuance of the agreement of the parties. According to its terms, its operation might be prevented in one, but in only one of the many modes by which a will may be revoked. The words which, the plaintiff insists, give character to the instrument as a voluntary act, “ and I give him that sum,” are by no means peculiarly and exclusively appropriate to a will, but belong rather to a gift: Whilst the preceding words are well adapted for expressing a stipulation founded on valuable consideration.
If however there were words denoting much more strongly than any to be found in the endorsement, that the endorsement was voluntary, it would by no means follow that either a will, or any other instrument revocable at the mere pleasure of the obligee, was *331 designed. For any words capable of binding the obligee with respect to the subject matter of the obligation, may, if endorsed by him at the time of the ■ execution of the bond, be treated as a condition. And whilst a parol executory gift, or promise to give, upon the death of the obligee, might not be binding, the same promise, if evidenced by a sealed instrument, I apprehend, would be; and would be as incapable of revocation or of being rendered inoperative, except in the mode or upon the contingency provided for in such instrument, as if the promise were founded on a valuable consideration.
I do not deem it necessary to make any comment on the evidence in relation to the conduct and declarations of the parties subsequent to the execution of the bond and endorsement, or to distinguish such of it as was incompetent from that which was competent to be used for the purpose of throwing light on the intention of the parties as to the operation of the endorsement, in as much as that testimony does not tend to alter but rather to confirm the views which I have taken of the case. Looking to the bond and endorsement and the proofs of the circumstances preceding and attending their execution, I have come to the conclusion that the endorsement was designed to operate not as a testamentary instrument, but as a condition or qualification limiting the duration of the obligation to the life of Smith. That, as such, it was not in the power of Smith to cancel the endorsement without at the same time canceling the bond; and that consequently the bond could not be enforced by the executor of Smith.
The case has been twice argued in this court, with an ability and a research on the part of the counsel of the respective parties commensurate to the interest and importance of the questions involved. The transaction is one of a novel character, and I have encountered difficulties in arriving at a conclusion, free from doubt, *332 as to its true import. After, however, having given to the subject the best consideration I could, I feel satisfied that justice will most probably be attained and the intention of the parties effectuated by permitting matters to remain as they are, and am for affirming the judgment.
Moncure and Samuels, Js. concurred in the opinion of Daniel, J.
Allen and Lee, Js. dissented.
Judgment affirmed.